IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville June 23, 2015

**KEVIN LaMONT BUFORD, SR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1355   J. Randall Wyatt, Jr., Judge**

_____

**No. M2014-01534-CCA-R3-PC – Filed August 11, 2015**

_____

The Petitioner, Kevin LaMont Buford, Sr., appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2010 convictions for facilitation to commit felony murder and attempt to commit especially aggravated robbery and his effective sixty-year sentence. The Petitioner contends that he received the ineffective assistance of counsel and that the post-conviction court erred by denying him relief. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

David Harris, Nashville, Tennessee, for the appellant, Kevin LaMont Buford, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Victor S. (Torry) Johnson III, District Attorney General; and Amy Hunter and Kathy Morante, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's and his four codefendants' engaging in a failed robbery attempt, which resulted in the death of Billy Jack Shane Tudor. The Petitioner appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

The first witness for the state was . . . the victim's mother. She testified that her son was employed at a lubrication shop and car wash on Clarksville Highway. She testified that at the time of his death the victim was building an

additional building beside the car wash, and that he had been doing so for about six months. She testified that her son was paid in cash each day for his work. She testified that almost every evening her son would go to a market next to the car wash to buy cigarettes.

The State's second witness was Officer Byron Boelter of the Metropolitan Nashville Police Department. Officer Boelter testified that . . . he received call to go to a location on Clarksville Highway because an individual had been shot at a car wash. He testified that he was the first officer on the scene. He testified that when he arrived, he saw a white male, dressed in all black, lying face down about fifty yards from the car wash. Officer Boelter testified that this individual was not breathing, his eyes were glassed over, and he had blood coming out of his mouth. . . . When the medical personnel rolled the victim onto his back and opened his shirt, Officer Boelter saw a small hole in the victim's chest that he believed was . . . a gunshot wound. . . .

On cross-examination, Officer Boelter testified that when he arrived at the crime scene, the gas station next to the car wash and the market across the street from the car wash were still open. He testified that there was probably a good amount of traffic on the road at that time of day. He further testified that at least two of the nearby businesses had security cameras.

The State's next witness was Officer Eric Richardson of the Metropolitan Nashville Police Department. He testified that he . . . found a shell casing near the car wash, and a picture of this item was entered in the evidence.

Following this testimony, the State presented Detective Norris Tarkington of the Metropolitan Nashville Police Department. Detective Tarkington . . . did a walk-through of the crime scene, and while doing so he found a spent shell casing on the ground near the front door of the car wash. He also found a folded twenty dollar bill and a lottery ticket on the ground just to the left of the shell casing. Pictures of these items were entered into evidence, along with some pictures of blood spatter and blood trails leading toward the car wash. On cross-examination, Detective Tarkington testified that there was considerable traffic on the nearby highway, and there was at least one surveillance camera located in the nearby parking lot.

The State's next witnesses were Donna and Darnell Jones, the mother and son who had been shopping at a nearby grocery store and who had called the police to report hearing gunshots. These witnesses testified that they had just finished shopping at the grocery store and were walking out when they suddenly heard gunshots. They rushed back inside, and soon thereafter they saw three black men run past the front of the market and get into an SUV, which immediately drove away. Darnell Jones testified that he took down the license plate number of this SUV. In addition, he testified that during the ensuing police investigation he was shown several photo lineups containing multiple individuals and that he identified two individuals from those lineups as being two of the persons that he saw running away that day.

The State's next witness was Mr. Raymond Pirtle, one of the defendant's codefendants. Mr. Pirtle testified that he had been a friend of the defendant's sons, D'Angelo Buford and Kevin Buford Junior, for many years but that he met the defendant for the first time on the day of the shooting. Mr. Pirtle testified that some weeks before the incident, he had bought a gun "off the streets" for his own protection. This gun was a 9mm Smith & Wesson. Mr. Pirtle testified that about three weeks before the incident, he gave this gun to D'Angelo Buford and Kevin Buford Junior, after they had asked him to borrow it. He testified that on the day of the incident, Kevin Buford Junior came to his house and asked him if he wanted to commit a robbery. Mr. Pirtle replied that he did. When he went outside, the defendant and D'Angelo Buford were also present, waiting for him in a gold SUV. Mr. Pirtle testified that the defendant was driving the vehicle. Mr. Pirtle testified that after he got inside the SUV, all four of them drove to a Burger King. He testified that at some point during this drive he heard D'Angelo Buford cock a gun.

When they arrived at the Burger King, the defendant told Mr. Pirtle that a friend of his had told him about a car lot that they could rob. Mr. Pirtle testified that the defendant told the other three to act as if they wanted to buy a car, and then, when the owner let them in, to rob him. Mr. Pirtle testified that he, Kevin Buford Junior, and D'Angelo Buford all got out of the SUV to rob the car lot, and he saw D'Angelo Buford carrying a gun at that time. He testified that as they approached the car lot, he told Kevin Buford Junior and D'Angelo Buford that he had a bad feeling. They appeared to agree, and after about three minutes all the three of them went back to the SUV. Mr. Pirtle testified that after they got back into the SUV, the defendant continued to urge them to rob the car lot, describing various methods the three might use to get

in. He testified that the three of them did not respond, and the defendant got angry and sped away.

Next, Mr. Pirtle testified that the defendant drove them to an Auto Zone, and told them to wait in the SUV while he went inside to see if there were any surveillance cameras. Mr. Pirtle testified that the defendant returned about five minutes later and drove away from the Auto Zone. During this drive, the defendant made a phone call to someone and asked the person on the other end of the call about robbing some white guy. Then the defendant pulled into a gas station. The defendant told the rest of the group that they did not have enough money to buy gas to return home, and he appeared unhappy about the situation. Mr. Pirtle testified that the group then left to go pick up some marijuana from one of Mr. Pirtle's friends, known by the street moniker "Little E," who lived in some nearby apartments. He testified that he got out of the SUV alone, went to his friend's house, and bought twenty dollars worth of marijuana.

Following this, the group drove to pick up Robert Buford, the defendant's brother, from his workplace. After picking him up, the defendant drove all five individuals to a liquor store . . . for the purpose of robbing one of the many people frequenting a nearby business. Mr. Pirtle testified that the defendant told the group that he knew "a place where a lot of Mexicans cash their checks," and that he suggested that they all stay in front of the liquor store, pretending to drink liquor. Mr. Pirtle testified that the defendant told the group that he was going to tell them which individual to rob after he watched them cash their checks. Mr. Pirtle testified that the defendant went into the liquor store and purchased some vodka, which was sampled by the entire group. Mr. Pirtle testified that the group had been waiting for about thirty minutes when the defendant stated that a woman who was cashing her check was about to come out and instructed him, D'Angelo Buford, and Kevin Buford Junior to rob her. Mr. Pirtle testified that when this woman came out of the store, the three of them told the defendant that they were not going to rob her, and the defendant drove away.

After the group left, various members put forward different suggestions concerning the next place they should go to commit a robbery. Mr. Pirtle testified that eventually the defendant told his son D'Angelo to call back "Little E" and request to buy some additional marijuana so that the group could rob him. D'Angelo did so. Mr. Pirtle testified that the defendant drove to a prearranged meeting location near a convenience store, and that Robert

Buford got out of the SUV carrying a gun. According to Mr. Pirtle's testimony, the plan was to allow "Little E" to approach the SUV, and then Robert Buford (whom the dealer had not met) would come from behind and rob him – thereby fooling the dealer into believing that he had been robbed by a random person. Mr. Pirtle testified that the group executed this robbery as planned. Afterward, the defendant drove the SUV a short distance away and picked up Robert Buford, who now had marijuana and some money.

Following this robbery, Mr. Pirtle testified that . . . the defendant then calmly told the group "now I got 15 minutes to do a robbery before I go and pick up my wife from work." Mr. Pirtle testified that at that point Kevin Buford Junior started acting "hyped up" – talking louder than normal and "swaggering." Mr. Pirtle testified that D'Angelo Buford tried to calm Kevin Buford Junior down, but the defendant discouraged his efforts. Mr. Pirtle testified that the defendant pulled into a car wash on Clarksville highway and parked the SUV. Mr. Pirtle testified that they saw the victim walking by, and the defendant stated that the victim looked like he had some money. Mr. Pirtle testified that the defendant told the others to go rob him. After the victim walked past the SUV, Kevin Buford Junior and Robert Buford got out of the car and followed him. Mr. Pirtle testified that Robert Buford had the gun with him at this time. Mr. Pirtle testified that he also got out of the SUV and followed the other two to assist them.

Mr. Pirtle testified that the victim walked into a grocery store, and they waited for him to come out. Mr. Pirtle testified that when the victim walked out of the store, Kevin Buford Junior ran over and hit the victim in the head with a gun. Mr. Pirtle testified that the victim turned around and swung at Kevin Buford Junior, and then Kevin Buford Junior shot the victim. The victim ran toward the nearby car wash. Mr. Pirtle testified that he, Kevin Buford Junior, and Robert Buford all got back into the SUV, and then the defendant drove them away.

Mr. Pirtle testified that during this car ride, the group was yelling at Kevin Buford Junior for shooting the victim. Mr. Pirtle testified that Kevin Buford Junior responded "he hit me, I did not know what to do." The defendant drove D'Angelo Buford and Kevin Buford Junior home. After dropping them off, the defendant drove Mr. Pirtle to a small market. Mr. Pirtle testified that he gave the defendant five dollars, and the defendant went into the store and bought him a cigarillo so that he could smoke the rest of his marijuana. The defendant then drove Mr. Pirtle home. Mr. Pirtle testified that

-5-

when he left, the defendant and Robert Buford were still in the front seat of the SUV.

Mr. Pirtle testified that . . . he did not have the gun [when the police arrested him], and the last time he saw it, it was in D'Angelo Buford's possession as he was being dropped off after the shooting.

Mr. Pirtle testified that . . . he had not been offered anything from the State in return for his testimony, but he was hoping for some sort of leniency. He testified that he had been in trouble at school, and sometimes suspended, for cutting classes, fighting, and possessing a weapon. In conclusion, Mr. Pirtle testified that the defendant was the person who had directed all of the various participants to do the various robberies on the day in question, including the attempted robbery of the victim.

. . . .

Mr. Pirtle also admitted that in January of 2008, he was a member of the Gangster Disciples and was living a "gangbanger's life." He admitted that he willingly joined Kevin Buford Junior, D'Angelo Buford, and the defendant on the day in question for the purpose of committing robberies, and he was a willing participant in the robbery and attempted robberies that were committed that day. He admitted that he had been previously arrested, that he had been disciplined at school on numerous occasions, and that he had been disciplined while in police custody for committing various criminal and antisocial acts. . . . He claimed to have left the Gangster Discipl[es] the year before, and he testified that he would not lie to protect his former gang members.

Mr. Pirtle testified that the defendant never held the gun on the day of the robberies. He testified that he never saw Kevin Buford Junior tell the victim to give him any money and never saw the victim give anything to him. He testified that Kevin Buford Junior did not get anything from the victim. He testified that the defendant did not know that anyone had been shot until the group returned to the SUV after the shooting.

Mr. Pirtle testified that although he had smoked marihuana and drunk vodka on the day of the robberies, this combination had not made it difficult for him to remember events as they happened that day. He admitted that he had probably told a doctor something to the contrary – that he had "blacked out" on the day in question – during his mental health evaluation but offered

no explanation for why he had done so. Defense counsel also impeached Mr. Pirtle with numerous prior statements he had made – both to police during the investigation and under oath at an earlier hearing – that were inconsistent with his trial testimony. Mr. Pirtle testified that he did not know why the defendant had stated that the group did not have enough money for gas to return home, given that the defendant had enough money to purchase vodka at the liquor store and that the defendant had driven them home after the shooting without filling up the SUV.

On redirect examination, Mr. Pirtle pointed out that the drug dealer the group had robbed on the day of the shooting was a fellow Gangster Disciples member. Mr. Pirtle also testified that D'Angelo Buford and Kevin Buford Junior were members of the Gangster Disciples. Mr. Pirtle explained that when he was answering questions posed by his doctor and the police, he was not under oath, as he was when he gave his direct testimony. Next, the prosecutor went over statements made by Mr. Pirtle at the earlier hearing in detail and generally attempted to explain away the apparent inconsistencies – partly on the basis that Mr. Pirtle's testimony at the earlier hearing was much more brief and less detailed. The prosecutor also emphasized the numerous statements made by Mr. Pirtle during his direct testimony that were consistent with his earlier testimony.

Following Mr. Pirtle's testimony, the defendant's wife's supervisor from the daycare center where she had worked in 2008 took the stand. The defendant's wife's supervisor testified that the defendant generally dropped off and picked up his wife from work. She testified that when he did so the defendant drove an SUV. The supervisor testified that on the night in question, the defendant's wife was scheduled to get off work at 6:30 p.m. The supervisor testified that the defendant picked her up slightly later than usual.

Following this testimony, Detective Harold Haney of the Nashville Metropolitan Police Department took the stand. He testified that he had retrieved video footage from a surveillance system at a nearby express lubrication facility after the crime. He identified a DVD he had created containing a copy of this video, which was . . . played for the jury.

The video depicts a parking lot in the foreground with a car wash running lengthwise in the background. Roughly seven and half minutes into this video, an individual can be seen walking from an area off-screen behind the car wash, through the car wash itself, and then through the parking lot

before finally walking off the bottom of the screen on the left hand side. Approximately twenty seconds later, two other individuals can be seen walking behind the length of the car wash, then following roughly the same path as the first individual through the car wash itself and down through the parking lot. One of these two individuals appears to stagger – as if laughing or intoxicated – while the pair are in the parking lot before they also disappear off the bottom of the left hand side of the screen. A few seconds later, a fourth individual walks through a car wash bay and walks off the right hand side of the screen.

Approximately a minute later, the video shows an individual walking up from the bottom left hand side of the screen through the parking lot, traversing approximately the same path taken by the first three individuals, discussed above, but in reverse. A second individual walks close behind the first one. Midway through the parking lot, the second individual appears to hit the first individual in the head from behind. As the first individual tries to run away, the second individual appears to point an object at the first individual and shoot him. The first individual staggers, and then runs through the car wash and off the right hand side of the screen. The third individual runs along the same route from the bottom of the screen and joins the second individual, and then the pair run toward the car wash before suddenly turning left and running off the left hand side of the screen. This entire series of events takes place in less than fifteen seconds.

After showing this video, the State called Detective Rob Hansen of the Metropolitan Nashville Police Department, who testified that he show[ed] three photographic lineups to witnesses Donna Jones and Donnell Jones. He testified that each lineup consisted of six photographs, which were matched by demographics, hair and skin tone. He testified that he prepared and showed the witnesses these lineups – one including the defendant, one including Kevin Buford Junior, and one including D'Angelo Buford. He testified that Donna Jones was unable to make any identification from these lineups, but that Donnell Jones was able to identify Kevin Buford Junior. He testified that he was aware that Donnell Jones also identified Mr. Raymond Pirtle from an additional lineup that he did not administer. . . . On cross-examination, Detective Hanson clarified that no witness had identified the defendant from a lineup.

The State's next witness was Ms. Jenness Schuhnann, who worked as a crime scene technician for the Nashville Metropolitan Police Department on the night in question. Ms. Schuhnann testified that she processed the crime

-8-

scene on Clarksville Pike where the victim was killed and that she took photographs and collected evidence there. She identified items she had collected from various sealed evidence bags – including a twenty dollar bill, a lottery ticket, a knit cap, and some shell casings – and these items were entered into evidence. Ms. Schuhnann explained where these items were found at the crime scene, and she identified photographs she had taken of them *in situ*. She also identified additional photographs she had taken of the crime scene, including photographs of the car wash and nearby buildings that showed different perspectives.

The State also called Dr. Kovach, a clinical psychologist at the Middle Tennessee Health Institute in Nashville who had performed a mental health evaluation of Mr. Raymond Pirtle. Dr. Kovach testified that the purpose of his evaluation was to determine whether Mr. Pirtle needed to be committed. Following the evaluation, he concluded that commitment was not necessary. In conjunction with this evaluation, the doctor testified that he performed a brief interview with Mr. Pirtle concerning the events that had occurred on the day of the shooting. Dr. Kovach testified that Mr. Pirtle told him that he was in a car with his friend and that he heard his friend's father say "go get him" before the murder was committed.

On cross-examination, Dr. Kovach stated that Mr. Pirtle told him during the interview that he was innocent, that he had never belonged to a gang, that he had robbed someone two or three times before, and that he had blacked out on the day in question due to his heavy consumption of alcohol. The doctor also testified that his notes did not reflect that Mr. Pirtle had ever told him that the group had attempted other robberies on that day or that the defendant had ever told him "we have fifteen minutes to do a robbery."

Next, the State called Mr. Johnny Lawrence of the Nashville Metropolitan Police Department, who . . . testified that he examined and tested an SUV for fingerprints and was able to recover several sets, which were sent back to the crime lab for identification. These prints were entered into evidence.

The following day, the State called Ms. Lorita Marsh, an identification analyst at the Metropolitan Nashville Police Department who was qualified as an expert in the field of latent print examination. She testified that she had examined certain fingerprints that were lifted by Mr. Johnny Lawrence from the doors and handles of the SUV after the shooting. She testified that after

analyzing these prints she was able to conclude that four of the prints matched Robert Buford, two prints belonged to Kevin L. Buford, and seven prints belonged to Mr. Raymond Pirtle.

The State also presented the testimony of Sergeant Chris Steele. . . . Detective Steele went over various crime scene diagrams with the jury and discussed the location of the victim's body and other evidence. He also discussed how he (1) interviewed Donnell and Donna Jones, (2) received and ran the license tag of the gold SUV, (3) came to order the defendant's vehicle to be stopped, and (4) interviewed the defendant following this stop . . . . Following this testimony, a videotape of the defendant's tape recorded interview at the police station was played for the jury. While questioning the witness concerning this interview, the prosecutor emphasized portions of the tape where the defendant initially admitted that someone named "Mac 10" had been in the SUV with him earlier in the day, and later claimed that someone named "Little E" had gotten in the car with him. Detective Steele testified that he later determined that "Mac 10" was the street name of the defendant's son, Kevin Buford Junior, and that he never identified anyone named "Little E." Detective Steele testified that the defendant was released following this interview. Detective Steele testified that the defendant was later indicted and arrested . . . and that following his arrest he was interviewed again. A videotape of this interview was also played for the jury.

On cross-examination, Detective Steele testified that the defendant had been honest during his interview when he (1) placed himself in the SUV on the day in question, (2) told him that he was driving it, and (3) admitted that his son D'Angelo had also been in the SUV as a passenger. Detective Steele further testified that the defendant never admitted in either police interview that he (1) had ever planned a robbery that day, (2) knew a robbery was about to occur, (3) knew that anyone had a gun, or (4) had pointed out the victim to the group. Detective Steele testified that when he interviewed Mr. Raymond Pirtle . . . , Mr. Pirtle did not tell him that the defendant had told him and Kevin Buford Junior to commit a robbery and did not mention their having committed a robbery earlier in the day or having engaged in any scouting activities.

Finally, the State presented the testimony of Dr. Sandra Thomas, a forensic pathologist at the Davidson County Medical Examiner's Office, who was qualified as an expert in the field of forensic pathology. Dr. Thomas testified that she had reviewed a report of the autopsy that was performed on

the victim by a colleague who had since moved out of state. Dr. Thomas stated that the victim had died of a single gunshot wound to the chest and that the bullet had pierced his heart, diaphragm, and spleen. Dr. Thomas stated that it would have taken the victim several minutes to die from this injury and that it would have been possible for him to move during this time.

*State v. Kevin L. Buford, Sr.*, No. M2010-01618-CCA-R3-CD, 2012 WL 1895953, at *7-15 (Tenn. Crim. App. May 24, 2012), *perm. app. denied* (Tenn. Oct. 17, 2012).

The Petitioner filed a petition for post-conviction relief alleging, in relevant part, that he received the ineffective assistance of counsel because trial counsel failed to investigate adequately whether Mr. Pirtle received a plea offer before testifying at his trial and to file a motion "demanding" information related to any plea offer or agreement. He also alleged ineffective assistance because counsel failed to raise in the motion for a new trial an issue related to the prosecutor's improper statements during closing argument, failed to investigate his case adequately, and failed to communicate adequately with him before the trial.

At the post-conviction hearing, the Petitioner testified that trial counsel's failure to raise in the trial an issue court related to the prosecutor's vouching for Mr. Pirtle's credibility prevented the issue from being considered in the appeal of his convictions. He recalled that this court waived consideration of the issue because counsel failed to raise the issue in the motion for a new trial.

The Petitioner testified that he was in confinement for four years before the trial and that he met with trial counsel more than five times regarding the "case-in-chief." He said, though, counsel did not discuss trial strategy. He said counsel planned to impeach the State's witnesses and noted counsel was interested in impeaching Mr. Pirtle about his untruthful statements. The Petitioner noted that Mr. Pirtle was the only codefendant who testified against him. He said Mr. Pirtle supplied the weapon for the killing and was indicted as a result. The Petitioner said he learned from counsel and from "the talk around the Justice Center" that Mr. Pirtle was going to testify. The Petitioner knew Mr. Pirtle had received a plea offer because Mr. Pirtle was not "an upstanding citizen" and because Mr. Pirtle had something to gain by testifying. The Petitioner also heard Mr. Pirtle talking "about getting a deal." The Petitioner and counsel discussed the matter, and counsel told the Petitioner that he would find out the terms of any offer and agreement but never learned the terms. He denied counsel filed a motion requesting information related to any plea offer or agreement.

The Petitioner testified that Mr. Pirtle also testified in two codefendants' trials and that trial counsel informed him of Mr. Pirtle's testifying. The Petitioner believed that although Mr. Pirtle and the State might not have had an agreement relative to sentencing, he

thought an agreement existed relative to Mr. Pirtle's testifying for the State in exchange for leniency. He said the prosecutor admitted during one of his codefendants' trials that an agreement was reached with Mr. Pirtle. He said that counsel could have cross-examined Mr. Pirtle fully and "brought out the fact of what exactly . . . went on and . . . [the prosecutor] wouldn't have been able to smooth it over like it never existed."

The Petitioner testified that he thought trial counsel could have "been more assertive in regards to his knowledge of the law." He said that an allegation was made relative to "something happening" to "Little E." The Petitioner said that counsel never mentioned going to interview "this person" to find out what, if anything, occurred. He thought this evidence would have damaged Mr. Pirtle's credibility. The Petitioner also wanted counsel to show more aggressively that the underlying felony was "never . . . established." Additionally, the Petitioner thought counsel should have focused more on the contents of the video recording. The Petitioner believed that had counsel focused on these aspects of the case, the Petitioner would have been convicted of a lesser charge.

On cross-examination, the Petitioner testified that the State presented several witnesses at the trial. He said that at some point before the trial, he heard that his son, Kevin Buford, Jr., accepted a plea offer and planned to testify against him.

Trial counsel testified that he had been a licensed attorney since 1996 and that he had worked for the public defender's office for eighteen years. He was the Petitioner's lead counsel at the trial. He said co-counsel worked with the Petitioner, discussed the case and trial strategy with counsel, and handled the agreed-upon portions of the Petitioner's trial. Counsel said he and the Petitioner met many times before the trial at the courthouse and at the jail. Counsel filed many pretrial motions, including a motion to compel the State to provide the defense with "whatever deal was in place for" Mr. Pirtle. He said the motion requested the State to reveal "any promises, agreements, wink and nod type agreements" involving Mr. Pirtle.

Trial counsel testified that codefendants commonly testified against each other and noted his concern that the Petitioner's son might also testify for the prosecution. Counsel recalled that he vigorously cross-examined Mr. Pirtle about any plea agreement. Although counsel had not reviewed the transcript of his closing argument, he knew he addressed Mr. Pirtle and objected to the State's argument relative to any agreement that "would possibly be made" with Mr. Pirtle.

On cross-examination, trial counsel testified that the pretrial motion relative to any plea agreement Mr. Pirtle had with the State was filed in October 2008, which was almost one and one-half years before the Petitioner's trial. He said savvy prosecutors usually told a

potential witness charged with criminal offenses that if he or she testified truthfully, the State would consider it afterward. Counsel noted that such a conversation placed the witness in a position to testify truthfully that he or she did not have a plea agreement with the State.

Trial counsel testified that Mr. Pirtle was the prosecution's key witness because Mr. Pirtle witnessed the offenses. Counsel noted that although a video recording showed how the killing occurred, the Petitioner was not seen in the recording. Counsel did not recall whether he knew Mr. Pirtle planned to testify in the Petitioner's codefendants' trials. Counsel said he attempted to show at the trial that Mr. Pirtle faced a life sentence and would have said anything the prosecution wanted in order to escape the punishment.

Trial counsel testified that his closing argument focused on Mr. Pirtle's lack of credibility. He noted Mr. Pirtle was a gang member, was untruthful, and provided inconsistent statements. After reviewing the motion for a new trial, counsel agreed he did not include an issue related to the prosecutor's vouching for Mr. Pirtle's credibility during her closing argument. He wished he could have "done more" on that point. He noted that the Petitioner was confined for about two years, not four, before the trial.

The post-conviction court denied relief. Relative to trial counsel's failure to allege in the motion for a new trial that the prosecutor improperly vouched for Mr. Pirtle's credibility, the court concluded that counsel did not provide ineffective assistance. The court found that counsel objected during the prosecutor's closing argument twice and that the trial court ruled accordingly. The post-conviction court noted that counsel raised multiple issues in the motion for a new trial and was not expected to raise every conceivable issue. The court also found that even if counsel were deficient in this regard, the Petitioner failed to show any prejudice because no evidence suggested that the issue would have had merit on appeal.

Relative to trial counsel's failure to investigate whether the State and Mr. Pirtle had an agreement, the post-conviction court found that the proof belied the Petitioner's assertion. The court credited counsel's testimony that he did everything in his power to uncover the details of any agreement. The court noted that although counsel's efforts were unsuccessful, which the court presumed was because no formal agreement existed, counsel elicited testimony from Mr. Pirtle that he hoped to obtain an agreement in the future. Likewise, the court found that counsel argued the same during his closing argument. The court found that before the trial, counsel filed a motion requesting information about the details of any agreement.

Relative to trial counsel's failure to investigate adequately and failure to communicate with the Petitioner before the trial, the post-conviction court credited counsel's testimony. The court found that counsel conducted a thorough investigation and met with the Petitioner numerous times before the trial.

On appeal, the Petitioner contends that the post-conviction court erred by concluding that trial counsel provided the effective assistance of counsel. He argues counsel was ineffective by failing to allege in the motion for a new trial that the prosecutor improperly vouched for Mr. Pirtle's credibility during her closing argument. He asserts he has established prejudice in connection with his ineffective assistance claim because this court waived consideration of the issue in the appeal of his convictions. He asserts the only "remaining question" is whether counsel's failure to include the issue in the motion for a new trial constitutes deficient performance, and he argues in the affirmative. He, likewise, argues for the first time on appeal that appellate counsel provided ineffective assistance by failing to request plain error review relative to the alleged improper vouching. The State contends that the Petitioner has failed to establish that trial counsel provided deficient performance or that any deficiency resulted in prejudice. The State also argues that the Petitioner has waived any ineffective assistance claim relative to appellate counsel.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As a preliminary matter, the Petitioner erroneously argues that he has suffered prejudice pursuant to *Strickland* because this court waived consideration of the issue related to the prosecutor's improper vouching of Mr. Pirtle's credibility. In order to establish prejudice based on the Petitioner's contention, the Petitioner must establish that but for trial counsel's alleged deficient performance of failing to include the issue in his motion for a new trial, the outcome of the appeal of the Petitioner's convictions would have been different had this court considered the issue on its merit. With this in mind, we consider whether counsel provided ineffective assistance.

The record reflects that trial counsel did not include in the motion for a new trial the issue surrounding the prosecutor's improperly vouching for Mr. Pirtle's credibility during the State's closing argument. The issue was first raised on appeal, and this court waived consideration of the issue pursuant to Tennessee Appellate Procedure Rule 3(e) and did not consider the issue as a matter of plain error. *See Kevin L. Buford, Sr.*, 2012 WL 1895953, at *27.

We note that no evidence was presented at the post-conviction hearing relative to the prosecutor's alleged improper vouching or trial counsel's objections and that the Petitioner does not identify the comments he considers improper. Counsel testified that he had not reviewed the transcript of the trial proceedings and could not recall if he objected to the

-15-

State's closing argument. In any event, the trial transcript submitted in the appeal of the convictions shows that the prosecutor referred to Mr. Pirtle's testimony during her closing argument. She stated, in relevant part,

Now, let's talk some about Raymond Pirtle, because there isn't any question but that he is at the center of this case. Let's talk about the deal. There is no deal. I have told Mr. Pirtle that if he testifies truthfully, not if he makes me happy as [counsel] wants to make it sound, but if he testified truthfully I, the State, will consider that in determining if he will get some sort of reduced offer and I am here to tell you that that is exactly what I am going to do.

Counsel objected on the ground that the prosecutor could not "personally discuss like that." The trial court stated that the prosecutor was only "arguing in rebuttal for what [counsel] suggested." The court told the prosecutor that she could not address "anything personal about what [the prosecutor] could do." The prosecutor stated,

I am here to tell you that he does not have a deal, but he was promised consideration and what that means is it will be considered, if in fact he testifies truthfully it will be considered to his favor and you know what? Sometimes we have to do that. It doesn't mean that the person who comes in here and testifies even if he testifies truthfully is going to walk, that is not what it means.

Counsel objected, and the court overruled the objection. The prosecutor continued without further objection. She stated,

[T]here are times when in order to be able to give a jury like yourselves the full picture of what happened . . . we have to do this. Now, is Mr. Pirtle a troubled youth . . . ? Yeah. He is a gangbanger. He admitted it freely.

He is a Gangster Disciple . . . no question about it, . . . and you know [counsel] said, well, would you trust him? Would you trust him? I don't know. [The Petitioner] trusted him when he needed somebody to go out and do an aggravated robbery that is who he went to along with his two sons who were members of the Gangster Disciples[.]

Now just think about it for a minute, if you wanted to do an aggravated robbery with someone would you go to your Sunday School teacher or your grandmother? No. You are going to go to these types of people. The State

did not [choose] the type of people that [the Petitioner] was going to get into this kind of environment with, he chose it, and that is where we are and . . . his demeanor, boy, this is a tough one to talk about because [counsel] seemed pretty convinced when he was up here that it was clear to everybody in here that he was not telling you the truth. You are the judges of that.

You are the judges of that, but don't get confused about one thing just because we believe that Mr. Pirtle is a gangbanger . . . that does not mean he was not being honest on the stand and you make your own decision, but I thought his demeanor here was pretty darn good, you know.

The cross-examination he went under I thought he kept his composure but that is for you to decide but it certainly could be concluded that he kept his composure with the kind of cross-examination he had[.] [T]here are some people, not even gangbangers, just your average person who has not been able to keep the composure that Mr. Pirtle kept in this court.

Inconsistencies, in closing argument [counsel] just said that there were all of these major inconsistencies but he did not really talk about very many of them and there was a lot of cross-examination about inconsistencies by [counsel] of Mr. Pirtle, . . . like sometimes I felt like it wasn't ever going to end, but most of those were about absolutely nothing. Do you remember the lengthy cross-examination about whether . . . [the Petitioner's son] came into the house or just to the house?

[Counsel is] making it sound like this was some giant lie, because at one point into the house and another time he said to the house and Mr. Pirtle said, look, you know I was going to open the door for him and let him in he just didn't come in. I mean, we spent how much time on that? That is nothing. That has nothing to do with any essential element of the crime, even if you think Mr. Pirtle was lying and I don't think that that is the reasonable conclusion for that.

I mean, the reasonable conclusion is to, in, I mean, we probably all say things like that all of the time. Same thing with one Vodka bottle, two Vodka bottles and then the cell phone, I mean my goodness the cell phone. Mr. Pirtle, did you . . . have a cell phone? Well, no. But you said before that you did, well, I mean, I have one, but I didn't know if I left it in the car. I didn't know where it was. But, you said you did and you told the officer the next day that you had a cell phone. Well, yeah, I did.

. . . It was an attempt by [counsel], he was doing his job to create inconsistencies. Those kind of things, first of all, again, I think any reasonable person understands what Mr. Pirtle was saying there. There wasn't truly an inconsistency; and second, even if it wasn't about anything essential, it was minor stuff and then you heard of course [the co-prosecutor's] very long list of consistencies. He told a consistent story on the major points.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001); *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *Bane*, 57 S.W.3d at 425. In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

The record reflects and trial counsel testified at the post-conviction hearing that Mr. Pirtle's credibility was a significant factor at the trial, that he cross-examined Mr. Pirtle extensively, and that he discussed during his closing argument Mr. Pirtle's lack of credibility. The prosecutor, as a result, addressed Mr. Pirtle's credibility in response to counsel's closing argument. The prosecutor told the jurors that they were "the judges" of Mr. Pirtle's credibility and discussed various factors that supported a reasonable inference that Mr. Pirtle provided truthful testimony in spite of minor inconsistences in his statements and his gang affiliation. However, the prosecutor's comment that she thought Mr. Pirtle's "demeanor . . . was pretty darn good" was an expression of her opinion about Mr. Pirtle's credibility. *See, e.g.*, *State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012) (Vouching occurs when a prosecutor expresses personal opinion that a witness is telling the truth). Likewise, relative to the minor inconsistencies in Mr. Pirtle's testimony and prior statements, the prosecutor told the jurors, "[E]ven if you think Mr. Pirtle was lying . . . [,] and I don't think . . . that is a reasonable conclusion[.]" The prosecutor's comment constituted improper vouching because it was an expression of her personal opinion about Mr. Pirtle's credibility. *See id*. at 420.

Although we conclude that the prosecutor made improper comments during the State's closing argument regarding Mr. Pirtle's credibility, we conclude that the comments were insignificant in view of the overall tenor of the prosecutor's closing argument. The record

reflects that trial counsel's cross-examination of Mr. Pirtle and counsel's closing argument focused on Mr. Pirtle's credibility. The prosecutor's improper comments were in rebuttal to counsel's suggestions that Mr. Pirtle was not credible and focused on the inconsistencies addressed by counsel. The remainder of the prosecutor's argument focused on other evidence and the reasonable inferences to be drawn from that evidence. We conclude that the comments did not affect the outcome of the trial and that the Petitioner is not entitled to relief on this basis.

Relative to any potential plea agreement, the prosecutor told the jury that no agreement existed at the time of the trial, and no evidence suggests otherwise. The prosecutor told the jury that she would consider Mr. Pirtle's truthful testimony in deciding whether Mr. Pirtle received "some sort of reduced offer." She explained that her consideration of Mr. Pirtle's truthful testimony did not mean he would not receive punishment for his role in the killing. We conclude that the prosecutor's comments were not improper and were in response to trial counsel's cross-examination of Mr. Pirtle and counsel's closing argument relative to Mr. Pirtle's motive to incriminate the Petitioner. We note that counsel objected twice during this portion of the prosecutor's closing argument and that the trial court overruled each objection. In any event, we conclude that any alleged deficiency in counsel's failure to raise the issue in the motion for a new trial did not result in prejudice. The Petitioner has not established that a reasonable probability exists that but for counsel's failure, the result of the motion for a new trial or the appeal of the Petitioner's convictions would have been different had this court considered the issue. The Petitioner is not entitled to relief on this basis.

The Petitioner also argues that appellate counsel was deficient for failing to request this court consider the issue of prosecutorial misconduct as a matter of plain error. Our analysis precludes the possibility that had appellate counsel raised the issue, plain error relief would have been granted. We note that the Petitioner failed to present any evidence at the post-conviction hearing relative to appellate counsel. The Petitioner is not entitled to relief on this basis.

The judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE